DANIEL FRY, APPELLANT, v. NELSON HAWLEY, APPELLEE.

H. and A. having obtained a contract to carry the United States mail from the port of Apalachicola to Chattahoochie, on the Apalachicola river, for four years, at a yearly stipend of about $2,600 ; and H. having informed one F. that he was desirous of purchasing a steamboat for the service, and that it would require about $6,000 to purchase one suitable in all respects, and that he, H., was to furnish one-half of said sum, and A. the other half, and that each was to own a moiety in the said contract and boat ; and F. agreeing with H. to furnish, and actually paying into the hands of H. one-half of the sum which he, H., had agreed to furnish, or $1,500—H. binding himself to give to F. an interest with himself to the extent of the amount placed in his hands, and that he, F., should share in the profits accruing from said contract, in proportion to that amount, " all losses to be borne equally ;" and the said boat having been built under the superintendence of A., and at an expense of $14,900, $6,000 of which sum was paid, and the balance secured by a mortgage upon the boat, which A. was authorized by H. to execute :—Held, that F. acquired only an interest in said boat in proportion to the amount furnished by him—that is, about one-tenth, instead of one-fourth, which was the amount of interest claimed by F. :—Held, also, that, although the balance of the purchase money was paid by the profits of the steamboat, the extent of the interest of F. therein was only one-tenth, he not

being liable upon the contract of purchase, the boat having been built under the direction and superintendence of A., and purchased by A., acting for himself and H.

The Hon. THOMAS DOUGLAS, Judge of the Eastern Circuit, and the Hon. J. WAYLES BAKER, Judge of the Middle Circuit, sat at the hearing of this case, in the place of Justices THOMPSON and SEMMES, who had been of counsel in the cause.

The following statement of the case was made by DOUGLAS, Justice, who delivered the opinion of the Court :—

This suit was instituted by Daniel Fry, the complainant, against Nelson Hawley, Benjamin Allen and Benjamin S. Hawley, defendants, to obtain the specific execution of a contract. The facts are as follows : viz : one Henry Allen and the defendant, Nelson Hawley, had entered into a contract with the United States, to carry a mail between Apalachicola and Chattahoochee, in Florida, for four years, at a yearly stipend or sum of about $2,600 ; and for the purpose of performing the said contract, as well as the business of carrying merchandize and conveying passengers, entered into an agreement on the 8th day of May, 1847, which agreement, under the hands and seals of the parties, is as follows, viz :

STATE OF FLORIDA—FRANKLIN COUNTY.

This agreement made and entered into between Henry Allen, of the State and County aforesaid, and Nelson Hawley, of the aforesaid State, and County of Gadsden, witnesseth—That the said Henry Allen and Nelson Hawley, being jointly interested in a contract with the United States, for carrying the mail for four years, commencing on the first day of July next, on the Apalachicola river, between the city of Apalachicola and Chattahoochee, on said river, known as route No. 2523, all in the State aforesaid, and in order to carry out said contract, do agree that the said Henry Allen, on his part, is to furnish in cash the sum of three thousand dollars, and the said Nelson Hawley, on his part, is to furnish the like sum of three thousand dollars. And

it is further understood and agreed that the said money, say six thousand dollars, is to be paid into the hands of the said Henry Allen, and he is to proceed at once to New Orleans, and if necessary, up the Mississippi and Ohio rivers, for the purpose of purchasing a suitable steamboat to carry out the conditions of the said mail contract—using his judgment and means to the best advantage in making a selection and purchase of said boat; and if found upon examination to be for the advantage of the parties interested to pay more than $6,000 for said boat, he, the said Allen, shall be authorized to give a joint note for the balance required, or secure the parties by lien upon the boat, as may be deemed most expedient, all necessary expenses accruing in purchasing said boat to be shared equally by both the above named parties. And it is understood and agreed that said Allen is to have command as master of said boat, or boats, at a reasonable salary, say one hundred dollars per month, and to give his undivided attention to the interests of the contractors. And it is further agreed that Daniel Fry is to be employed in the capacity of engineer, to furnish his second, at a salary of one hundred and thirty-five dollars per month, so long as he faithfully discharges his duties in the above capacity, to the satisfaction of the master of said boat. And on the same day, (8th day of May, 1847,) after said agreement had been executed, an arrangement was made by the said Nelson Hawley and the complainant, as evidenced by a receipt given by the said Hawley, which is in the following words, viz : " Received of Daniel Fry fifteen hundred dollars, to. be invested in a steamboat by Captain Allen, for the purpose of carrying the mail between Apalachicola and Chattahoochee, for the term of four years, commencing July 1, 1847; Nelson Hawley being jointly interested with Captain Henry Allen in the above mentioned contract, binds himself to give to the said Fry an interest with himself, to the extent of the amount placed in his hands, and in proportion to that amount, he is to share in the profits accruing

from said contract. Said Nelson Hawley further binds himself to consult and advise with said Fry in all matters of importance in regard to the said joint interest—all losses to be equally borne. (Signed) Nelson Hawley."

This receipt contains the agreement, the specific execution of which is sought to be enforced by this suit; the complainant claiming that he is entitled to a conveyance of one *equal* moiety, or *one-half* of the interest of Nelson Hawley in the said steamboat, and to one-fourth of the nett profits of the whole contract, in virtue of said contract or receipt. Nelson Hawley, on the other hand, contends that the complainant is only entitled to one-tenth interest in the said steamboat, and one-tenth of the nett profits of the said contract. Nelson Hawley placed the sum of $3,000 in the hands of the said Henry Allen, and he proceeded to Cincinnati, for the purpose of purchasing the desired steamboat, but not being able to purchase one which, in his judgment, would suit the business, he contracted for the building of one, to be called the Quincy, for the sum of $14,900, three or four thousand dollars of which (the exact sum is not stated) was paid in cash, and $6,000 in drafts or bills representing cash, and the balance of the cost was secured by a mortgage executed by said Allen on the boat, he having contracted for and taken a title to her in his own name *alone.* The boat was completed and brought to Apalachicola river about the month of October, 1847, the said Henry Allen acting as master, and the complainant as engineer; and it appears by the proofs in this cause that he has continued in that service ever since, with his brother as his assistant, at a salary of $135 per month. The said steamboat commenced running and carrying the mail as contemplated after her arrival in the Apalachicola river, under the command of the said Henry Allen, who, some short time after her said arrival, conveyed one-half interest in her to the said Nelson Hawley. It appears by a *balance sheet* of the said steamer, annexed to the answer of the said Hawley, that, on the 22d day of July, 1848, the boat had made a suf-

ficient amount of profits to pay off the balance then due of her purchase money, amounting to $8,900, and leave a sum to her credit of $988 91 ; and the report of a special master, to whom the matter had been referred by a decretal order of the Circuit Court on the 27th of December, 1849, shows that, on the first day of January of that year, (when a receiver had been appointed,) " the profits of the steamer Quincy from her arrival upon the said river had been $12,-930 51." The special master also reported (under the said decretal order) that the costs of the said steamer, on her arrival at Apalachicola, was $15,000 ; that the sum advanced by the complainant, Daniel Fry, was $1,500; that this amount bears a proportion to the whole cost of the boat of one-tenth, and that the complainant having contributed one-tenth of the original cost, is entitled to one-tenth of the profits, say $1,293 65. The report of the master was confirmed, and the Court "decreed that Nelson Hawley, defendant in this suit, by good and sufficient deed, to be prepared by the master in chancery, do convey to complainant, Daniel Fry, one-tenth interest in and to the steamboat Quincy, her tackle, apparel and furniture ; and further, that the receiver theretofore appointed in this case, pay over to the said Daniel Fry one-tenth portion of the nett proceeds of said steamboat up to the present time—deducting whatever sums may have been paid or received by the said Fry out of said proceeds, and that the balance of said funds in the hands of said receiver be paid over to said defendant, Nelson Hawley. And it was further ordered that the injunction in this case be dissolved, and that defendant do pay the costs of this suit, except the cost of said receiver, which is taxed at fifty dollars, and twenty dollars to be paid to Samuel W. Spencer, special master, and which it was ordered that complainant do pay. From this decree, the complainant appealed to this Court.

*Maxwell*, for the complainant and appellant.

For the complainant it is contended that, by virtue of this

agreement between Hawley and himself, he is entitled to an equal share in the boat with Hawley and to an equal participation in the profits or earnings, and that the agreement is susceptible of no other fair interpretation.

The agreement between complainant and Hawley is founded upon the agreement or contract between Allen and Hawley, to which it refers. The latter constituted a joint undertaking between the two parties to carry the United States mail, passengers and merchandize, of which the capital or joint stock is $6,000 in money, in equal moieties of $3,000 each. Although it may have been intended that they were to be tenants in common of the boat when purchased or built, yet it is so blended with the employment that the contract may be termed a *quasi* partnership.

The usual relation of part owners of a vessel is that of tenants in common, but they may become partners. When a person is to be considered as part owner or as partner in a ship depends upon circumstances. 3 Kent's Commentaries, 154, 155. Holderness v. Sheckels, 8 Barnewall & Creswell, 612. Lamb v. Durant, 12 Massachusetts, 54. Harding v. Foxcroft, 6 Greenleaf, 77. Seabrook v. Rose, 2 Hill's Chancery, 555.

But whether the parties are to be considered as partners or part owners is not material to this controversy—the distinction between the two characters will not affect the claim of complainant. So far as his rights are involved herein, there is no difference between the two positions. Hawley receives from Fry $1,500 in cash, and, in consideration of the sum so paid, binds himself to give Fry an interest with himself in the contract he had entered into with Allen to the extent of the amount so placed in his hands, and in proportion to that amount he (Fry) is to share in the profits accruing from said contract, and stipulates that all losses shall be equally borne ; and this contract the complainant seeks to enforce.

It is admitted that every contract, deriving its force from

the mutual assent of the parties, is to be interpreted according to the intention of the parties, so far as it is legal and mutually understood, (Story on Contracts, second edition, § 634;) and that the exposition is to be upon the whole contract, and not upon disjointed parts taken separately. Ibid, § 657, and authorities cited.

Yet it is equally true that, where the language of the instrument is neither uncertain nor ambiguous, it is to be expounded according to its apparent import, and is not to be warped from the ordinary meaning of its terms, in order to harmonize it with uncertain suppositions, in regard either to the probable intention of the parties contracting, or to the *probable changes which they would have made* in their contract, had they foreseen certain contingencies. Whenever the words are *clear* and *definite*, they must be understood according to their grammatical construction, and in their ordinary meaning. Story on Contracts, second edition, § 639. 2 Evan's Pothier on Obligations, 37.

The rule that " parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument," is said to admit of an exception when, in equity, a party seeks a specific performance of an agreement, the defendant may show fraud, accident or mistake—that such a decree would be against *equity* and *justice*, by parol evidence of the circumstances, even though they contradict the writing. 1 Greenleaf on Evidence, § 296, a.

In this case there is no fraud, accident or mistake in reducing the contract to writing alleged in the answer of defendant ; and I am willing that the language employed may be " read by the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties ;" and shall confidently contend that the decree which the complainant seeks for is neither inequitable nor unjust.

Hawley's agreement with Fry is made with special reference to the agreement or contract he had made with

Allen ; and to understand the meaning of the terms, "an interest with himself" in it, "to the extent of the amount placed in his hands," it is only necessary to ascertain what was the interest of Hawley in the joint concern of Allen and Hawley, and what proportion the contribution of Fry bears to it ; and in this examination I invoke the whole of the two instruments, and not disjointed and separate parts of either.

The evidence discloses, and it is also conceded, that Hawley was entitled to a moiety of the boat, by reason of the contribution of one-half the stipulated capital, say $3,000, as between himself an Allen.   Now, Fry's contribution being $1,500, or one-half thereof, does it not make the extent of his interest with Hawley just one-half—in other words equal with Hawley ?   And is not this confirmed by the subsequent stipulation that all losses are to be *equally* borne ?   Hawley's interpretation that it is the proportion which $1,500 bears to the whole cost of the boat is a strained one—if, indeed, that can be called an interpretation which is not sustained by the language of the agreement, *per se*, nor with " the aid of the light of the surrounding circumstances."

It was conceded in argument below, and so considered by the Court, that if the boat had cost but $6,000, the amount of the capital, the complainant would have been entitled to one-fourth part of the whole, and an equal share with defendant, Hawley.   The fact that the boat cost $15,-000, does not at all vary the result of our interpretation ; for it is not pretended that Hawley, or Allen, or any one else contributed any additional money to the capital to be invested in the enterprize, but the residue of the cost of the boat, over the amount of the capital, was provided for by a hypothecation of the whole boat, which included as well Fry's interest, or contribution, as that of Allen and Hawley ; and from the *nett profits*, this debt was paid off on the 28th July, 1848.

The learned judge below seemed to consider that the cost
34

of the boat exceeding the capital produced an ambiguity, which could only be cleared away by parol evidence, and that it must be considered as latent. With all due respect, I think this is erroneous. This circumstance produced no change in the contract—could not render it obscure, or affect the mutual rights of the parties. At the time of the contract, it was not definitively ascertained what would be the cost of the boat, although it seemed to be within the idea of the parties that the capital contributed might be sufficient. The agreement between Allen and Hawley, executed the same day, and we may presume immediately prior to the agreement in controversy, and referred to in the latter, provides that the capital is to be paid into the hands of Allen in cash, and he is to proceed to New Orleans, up the Mississippi and Ohio rivers, for the purpose of purchasing a *suitable* steamboat; and if found upon examination to be for the advantage of the parties interested *to pay more than* $6,000 *for said boat*, he, the said Allen, shall be authorized to give a joint note for the balance required, or secure the parties by *lien on the* boat, as may be deemed most expedient." It thus appears that the agreement is a continuing one—it was for the purchase of a *suitable boat*, and would, of necessity, embrace any boat that might be purchased, regardless of the cost. The price was unknown, and the investment was confided to the skill and discretion of Allen. If the capital had been increased by additional contributions from Hawley and Allen, then Hawley might have some foundation for his pretensions, if Fry, upon application, had declined to increase his contribution in similar proportion; but this is not the case—there was no change in the original contract.

Hawley never ventured any more money in the enterprize; but if he had advanced more money, otherwise than as a contribution to the capital, he would have been a creditor of the company only, to the amount so advanced and interest. Conwell v. Sandige, 5 Dana, 212.

A Court of Equity will not give a strained construction to a contract to create a *societas leonina.* Upon what principle of equity, can Hawley's interest, under his agreement with Fry of May 8, 1847, be greater than that of Fry? The learned judge below says, " the evidence shows that Fry only put into the original venture fifteen hundred dollars, and to that interest and rateable profits, he is entitled." Is it not also true, that the evidence shows Hawley only put into the original venture fifteen hundred dollars? and it is respectfully asked, upon what principle of equity, justice, reason, or common sense it is, that Hawley's $1,500 is entitled to four-tenths of the boat and profits, and that Fry's $1,500 is only entitled to one-tenth of the boat and profits? and this, too, in face of Hawley's stipulation in the agreement, that Fry is to have " an interest with himself, to the extent of the amount ($1,500) placed in his hands, and in proportion to that amount he is to share in the profits accruing from said contract," and "all losses to be equally borne?" In the absence of all stipulation, equity would divide the profits, or nett gains, according to the contributions to the capital, or equally. It is only by express agreement and stipulation, that one partner can claim a larger share of profits than his co-partner. 3 Kent's Commentaries, 28, 29.

Why fix Fry's interest at one-tenth of the boat, except upon the hypothesis that the capital invested was $15,000, which is contradicted by the testimony? The capital of the company was settled at $6,000—to this extent only did the parties contribute. The additional $9,000 of the cost of the boat was a debt of the company, which Hawley, might or might not have been liable for ; and whether he was so liable or not, the learned Judge below in his opinion considers immaterial. He says : " Fry certainly did advance as much money as Hawley, but that Hawley in his contract with Allen incurs a responsibility not shared by Fry, and gives Allen a *carte blanche* to use his name upon any notes which might be necessary to complete the pur-

chase; and whether this were done or not, matters little, further then it goes to show what was the real state of affairs at the time the contract was made, and what, at least, was Hawley's intention." And he asks, " if Fry was aware of this contract, why did he not, in his with Hawley, have a provision inserted covering the purchase of a boat which might cost more than $6,000 ?" Of course, Fry was aware of this contract—he could not have been ignorant of it—the contract of Allen and Hawley is referred to in his agreement with Hawley; but the answer is obvious. Fry, although the partner of Hawley, was not the partner of Allen in the purchase of the boat, and in purchasing of Hawley a moiety of his interest in said contract, he incurred also a moiety of Hawley's responsibilities. This was the condidition. It is asked, if the boat had been lost coming to Apalachicola—or if Hawley had paid up the purchase money due upon the boat, and she had been then lost—could he have any claim upon complainant ? The answer is, yes ; for it is stipulated between Hawley and complainant, that " all losses shall be equally borne."

It is said that Fry could have pointed to the agreement, and shown that his responsibility was limited to the $1,500 paid by him, and that he could lose no more. Not so. Fry had agreed with reference to the agreement between Allen and Hawley—he knew from this, that a *suitable boat* was to be procured, even if the cash capital was insufficient, and that a credit was to be obtained for the remainder of the purchase money, to be secured by the joint note of Allen and Hawley, or by lien on the boat. It is further in evidence, that he accompanied Allen in his search for a suitable boat, and that the steamer Quincy was built, and he served on board of her as engineer from Cincinnati, the place of building, to Apalachicola, and as he uttered no dissent, by his acts and conduct he would have been estopped to deny his acquiescence in the purchase of the boat, and his liability to Hawley for a moiety of the debt thus

incurred.   Pickard v. Sears, 33 English Common Law Reports, 117.   Gregg v. Wells, 37 English Common Law Reports, 58.   Camp v. Parkhill, 2 Florida Reports, 197.

But the debt for $9,000 to the builders was secured by hypothecation of and lien upon the boat, and, therefore, the position that the credit should extend to the increase of Hawley's interest and profits alone, cannot be supported in equity, or justice.   Fry had as much at stake as Hawley had—he had advanced to the enterprize as much money, and that which he had contributed was charged with, and liable for, the debt equally with Hawley's.   If the boat had been lost, or had been unable to make sufficient gains or profits to pay the debt, and it had been seized or sold, Fry would have lost as much as Hawley would.   According to the agreement and the evidence, Hawley was not under any greater degree of liability or responsibility than Fry was; for if Hawley had incurred any loss, or had been compelled to pay any money, Fry was bound to contribute.

In building the boat and fitting it out for service, Allen, it is to be inferred from the evidence, was the only person known to the builders—they made a bill of sale of the boat, when finished, to him alone, received from him the payment of $6,000, and the hypothecation of the boat for the balance due, $9,000 ; and Allen retained the title until the debt was paid in July, 1848, from the profits, when he conveyed one moiety to Hawley.   Upon the principle which Hawley contends for, Allen could have claimed eight-tenths of the boat, and it seems with more show of propriety than Hawley's case exhibits as against Fry.

The learned Judge below says, " the moment the boat was purchased, Hawley became liable to Allen, if he, Allen, paid more than his portion, by way of contribution; and being regarded in the eye of the law as joint owner with Allen, was subject to all and any loss with him." And why is this rule not applicable to the relation which subsisted between the complainant, Fry, and the defendant, Hawley ?

When Hawley became liable to Allen, as joint owner of the boat with him, for additional contributions and all losses, is it not equally true that complainant, Fry, became liable to Hawley, for his moiety of any additional contribution, he, (Hawley,) should make, or for his moiety of the losses, because he, (Fry,) was joint owner with Hawley of the one moiety of the boat? Are not these the terms upon which Hawley admitted Fry to a participation with him in his share of the enterprize? This is conclusively proved by a reference to the agreements and the evidence?

Suppose A and B enter into any joint undertaking for the transaction of business, but in which B is a silent or secret partner, unknown to the community, although he contributed one-half of the capital. A enters upon the business, invests the cash capital, and obtains credit for other property, goods, &c. used in the business, beyond the capital.—Will equity permit A, upon a dissolution or settlement, to say to his partner, you are entitled to the profits only upon the amount of cash actually contributed by you—the profits upon the credits obtained are mine exclusively, for you were not known as partner with me? Clearly not; and wherein does the case at bar differ from it?

If the position assumed for Hawley be correct, then it must be admitted that Fry made a most silly bargain—his capital was at risk of loss, without compensation, or at most, a very remote and small benefit. 1. His share of the boat was implicated for Hawley's benefit, as the security of a portion of the debt of $9,000. 2. While thus implicated, it was making for Hawley four dollars for one dollar for Fry. 3. The fifth which it was thus making for Fry, was also implicated for the debt upon the boat, and only receivable when the debt was discharged; for he was not the partner of Allen, but of Hawley—his claim to the profits is through Hawley; and it is not to be presumed that Allen would permit a dollar of the profits to be withdrawn until the debt was paid; and if any accident had happened prior to that

event, Fry's capital as well as profits would be involved in the catastrophe ; while Fry was liable for an equal portion of Hawley's losses, if any, beyond the $1,500 in cash invested. Truly, this is a perfect illustration of the *societas leonina* of the civilians. To escape from this injustice, the learned judge below interprets " *equally*" to mean "*proportionably ;* but they are not synonymous or convertible terms, nor is there any necessity to a fair and perfect understanding of the contract, that the language should be changed to harmonize. Besides, it would only meet a part of the objections to such a construction.

The language is neither uncertain nor ambiguous, and is not to be warped from the ordinary meaning of its terms— the words being clear and definite, they must be understood according to their grammatical construction, and in their ordinary meaning. Story on Contracts, (2d edition,) § 639.

The principle asserted by the learned judge below, that a party seeking a specific performance must show that the agreement is certain and fair, and the remedy mutual, is admitted. Goldsmith's Equity, 79. Story's Equity Jurisprudence, § 723. 1 Johnson's Chancery Reports, 282, 370.

It is contended here that the agreement on its face, and by equitable interpretation, is both certain and fair ; that nothing is asked for by complainant which is either inequitable or unjust ; that, so far as the principle of mutuality is involved, the agreement on the part of complainant is *executed*—he paid the amount of his contribution at the time of entering into the contract. It is not proper to resort to conjecture, or to possible cases which might occur, in order to show that a state of case might arise in which there would be a want of mutuality, although in this case such a line of argument might be successfully refuted.

An agreement must depend on the circumstances at the time, and cannot be made better or worse by subsequent facts. Morris v. Burroughs, 1 Atkyns, 404.

In cases where, when the specific performance would be·

attended with great loss and hardship to the defendant, the Court has not decreed a specific performance, but has directed an issue to try what damages the party has sustained by non-performance of the agreement. See City of London v. Nash, 3 Atkyns, 516.

Such, however, is not the case at bar—it will be attended with no real loss or hardship to the defendant, Hawley, to yield up to the complainant the just and full share of the profits of his capital—to give him a share in the contract to the extent of the amount contributed, and a participation in the profits in proportion to that amount. A court of law could not, by way of damages, give to the complainant full and adequate relief.

The case of Brashier v. Gratz cited below is wholly inapplicable. There the complainant was in default—a considerable length of time had elapsed, and there had been a great change in the title and value of the land, and the Court held very justly there was a want of reciprocity, and declined to interfere. 5th Peters' Condensed Supreme Court Reports, 161.

So, also, in Benedict v. Lynch, cited in opinion of the Court below, the contract stipulated that if the vendee did not comply with the covenant to pay as stipulated, the contract should be *void;* the vendee made default, some two or three years elapsed, and the vendor sold the land to another— the Court, under the circumstances, refused the prayer for a specific performance. 1st Johnson's Chancery Reports, 370.

Now, the facts of these cases bear no analogy to the case at bar, and the principles held therein are entirely inapplicable. Here there was no default on the part of Fry—his portion of the contract was executed—he had contributed in money his share of the capital—as joint owner with Hawley, he was responsible for a moiety of his share of liability or loss, and by his acts and conduct, he was estopped to deny his acquiescence in the debt of $9,000 incurred in building and fitting out the boat.

He has not so conducted himself as to be obnoxious to the principle of equity quoted by the learned Judge below, from Story's Equity Jurisprudence, § 750—he has not led to the defeat of any legitimate object of Hawley, nor has the character and condition of the property been so altered, that the terms of the original contract will not apply to it. A reference to the authority cited by Justice Story, will show that it can have no application to the case here. See Duke of Bedford v. British Museum, 8th Condensed English Chancery Reports, 128.

It is admitted that the question of specific performance is one addressed to the discretion of the Court—not of arbitrary and capricious discretion, but of that sound and reasonable discretion, which governs itself, as far as it may, by general rules and principles ; but, at the same time, which withholds or grants relief, according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties.   Story's Equity Jurisprudence, § 693, 742, 769.

To this discretion, as expounded by the learned jurist, we appeal with confidence for a judgment of reversal, and for a decree granting the prayer of complainant's bill.

*Davis,* for respondent and appellee.

1. The right of Fry to any share in the boat must depend on the written agreement.

2. Subsequent acts cannot be given in evidence to explain any ambiguity in the written contract. Chitty on Contracts, 106.  Comyn on Contracts.

3. To entitle Fry to a specific performance of the agreement which he insists on, it must appear that Hawley had a remedy against him to compel performance of his (Fry's) part of the contract.   The remedy must have been mutual. Benedict v. Lynch, 1 Johnson's Chancery Reports, 370. Ibid, 282.   2d Story's Equity, section 723.

4. The words " joint interest" do not warrant the conclusion that an equal interest was intended. Collyer on Part., 13.

35

5. To interpret the contract the whole must be taken together. The words "all losses to be equally borne," when taken in connection with the rest of the agreement, must be construed to mean that the losses are to be borne by each in proportion to his share.

6. The debt contracted by Allen in building the boat was in no wise a liability of Fry. Hawley and Allen alone were bound. Fry was not liable even to Hawley.

7. The fact that the share of Fry was left undetermined is evidence that he did not contract for any specific part.

8. If Fry did not contract for a fourth, the fact that he did not demand his portion of the earnings or his wages gives him no claim to any greater share than that which he was entitled to under the contract. There is no proof that he demanded his profits or wages, or that he was requested to let them remain in the hands of Allen and Hawley.

9. The mortgage of the boat was a necessary consequence of the agreement between Allen and Hawley. Fry had no legal interest until Hawley made him a title. If Hawley failed to do so, Fry had his action to recover the sum deposited with Hawley.

10. The nature of the contract between Fry and Hawley was not a sale of an interest, because the thing was not in *esse.* It was in the nature of a trust. Hawley was bound by the contract to constitute Fry an owner in a steamboat, and an owner in a mail contract "to the extent" of the cash paid by Fry. Fry was to have $1,500 in value of the property.

11. The answer of Hawley and the admissions of Fry all disprove the allegations of the bill. If the case rests on the contract, Fry cannot claim more than the rateable interest, which $1,500 bears to the whole sum. If it is put on the answer and the testimony, he can only be entitled to the same one-tenth. Upon the whole, the decree was correct, and nothing has been adduced to change it.

DOUGLAS, *Justice,* delivered the opinion of the Court. This case has been fully argued by the counsel for the

respective parties, and the questions presented for our consideration are, what interest the complainant is entitled to in the said steamboat, and what share of her nett profits he ought to receive.

It is admitted that every contract, deriving its force from the mutual assent of the parties, is to be interpreted according to the intention of the parties, so far as it is legal, and mutually understood. Chitty on Contracts, pages 148, 149, 1st edition, sections 228, 231, and that exposition is to be upon the whole contract, and not upon disjointed parts taken separately. Page 167, section 252.

For the complainant, it is contended that, by virtue of this agreement between Hawley and himself, he is entitled to an equal share in the boat with Hawley, and to an equal participation in the profits or earnings, and that the agreement is susceptible of no other interpretation.

That Hawley's agreement with Fry was made with special reference to the agreement or contract he had made with Allen, and to understand the meaning of the terms, " an interest with himself," it is only necessary to ascertain what was the interest of Hawley in the joint concern of Allen and Hawley, and what proportion the contribution of Fry bears to it.

That the evidence discloses, and that it is also conceded, that Hawley was entitled to a moiety of the boat, by reason of the contribution of one-half the stipulated capital, say $3,000, as between himself and Allen ; and Fry's contribution being $1,500 or one half thereof, makes the extent of his interest under Hawley just one-half—in other words, equal with Hawley's, and that this is confirmed by the subsequent stipulation, that " all losses are to be equally borne."

That Hawley's interpretation, that it is in the proportion which the $1,500 bears to the whole cost of the boat, is a strained one, and that a Court of Equity will not give a strained construction to create a *societas leonina*. The last proposition we deem a sound one. But we understood the

position of the defendant's counsel to be, that Hawley was entitled to a moiety of the boat, on account of his contribution of $3,000, and of his having given to said Henry Allen authority to use his name, to procure a credit to any amount beyond the sum of $6,000, that might be necessary to procure a steamboat suited to the accomplishment of the objects they had in view, viz: the carrying of the mail, and the transportation of merchandize, conveyance of passengers, &c.; he (Hawley) thus making himself equally liable with said Allen for any debt which the latter might contract in effecting that object. And this we consider a correct view of that matter, and we are unable to perceive why Hawley's interpretation of his contract with Fry is a strained one. To interpret the contract, the whole must be taken together. "Faithful interpretation implies that words, or assemblages of words, be taken in that sense which we honestly believe that their utterer attached to them." Lieber's Hermeneutics, 99. "Since our object is to discover the sense of the words before us, we must endeavor to arrive at it as much as possible from the words themselves." Ibid, 113. The whole of the agreement is to be considered—the construction is upon the *entire* deed or agreement, not merely upon disjointed and particular parts of it. The whole context shall be considered in endeavors to collect the intention of the parties, although the immediate object of inquiry be the meaning of an isolated clause.— Chitty on Contracts, 6th American edition, 83. Now, what are the words we are called upon to interpret ?—" All losses to be equally borne. What is the instrument we are called upon to construe ?—The receipt of Hawley to Fry, viz :

"Received of Daniel Fry fifteen hundred dollars, to be invested in a steamboat, for the purpose of carrying the mail between Apalachicola and Chattahoochee, for the term of four years, commencing July 1, 1847 ; Nelson Hawley being jointly interested with Captain Henry Allen in the above named contract, *binds himself* to give to said Fry an

*interest with himself to the extent of the amount placed in his hands,* and *in proportion to that amount,* he is to share in the profits accruing from said contract. He further binds himself to consult and advise with said Fry in all matters of importance in regard to said joint interest." What joint interest ?—the joint interest of Hawley and Allen. Now, the contract here spoken of, is the contract for carrying the mail, and the joint interest mentioned, is the interest of Hawley and Allen in that contract. No reference is here made to the agreement between Allen and Hawley about the purchase of the steamboat. The object in view, viz : the carrying out of that contract to convey the mail, appears from the fact that the $1,500 advanced by the complainant, was to be invested in a steamboat by Captain Henry Allen for that purpose; and Nelson Hawley being jointly interested with Captain Henry Allen in that contract, binds himself to give the said Fry *an interest with himself to the extent of the amount placed in his hands,* and in *proportion to that amount,* he is to share in the profits accruing from said contract. Why all this circumlocution, if it were intended that Fry should have an equal interest both in the steamboat and in the profits accruing from said contract ? Why did not Hawley say, being jointly interested with Captain Henry Allen in the above mentioned contract, I bind myself to give the said Fry an *equal* interest with myself in said contract, and an *equal share* of the profits accruing therefrom ? It would have taken fewer words, and been clear of all doubt—no room would have been left for construction, and in the agreement which he had on that very day executed with Captain Allen, he had a precedent for so drawing it. If the instrument had stopped here, no question, we think, would have been raised about its construction—the whole difficulty then rests upon the words, " *all losses* to be equally borne." But the construction must be reasonable—it must also be as near the minds and apparent intents of the parties as the rules of law

will admit.    2d Blackstone's Commentaries, 379; and it is essential to consider the subject-matter of the agreement, in affixing a meaning to the terms used therein.    Chitty on Contracts, 6th edition, 74.    The subject-matter here was a portion of this steamboat and of the contract mentioned, and the question is, the extent of those interests intended to be conveyed. If these words must be understood to mean that Fry must bear the same amount of any loss as Hawley, and that, consequently, he (Fry) shall have the same interest in the steamboat and in the profits of the contract as Hawley, then it results that Fry, for the sum of $1,500, is to have as large a share of both as Hawley, who has paid $6,000.    We do not lose sight of the fact, that some five or six thousand dollars balance due on the boat, was paid out of the profits accruing on the contract, or that the boat was mortgaged to secure that debt; but it was the debt of Allen and Hawley; and if they had suffered it to be sold to pay their debt, Hawley would have been liable to Fry for his $1,500, unless, indeed, they had procured another boat, and Hawley had given him an interest in it according to his contract, which he would have had a right to do; for the agreement between Hawley and Fry did not specify that the $1,500 should be invested in any particular boat—such a result would certainly be a very onerous and unequal one, and comes pretty well up to the idea of a *societas leonina*.    But we see no good reason for so interpreting this contract.    From the phraseology of the whole instrument, and the reason and justice of the case, it seems to us quite clear, that the *intent* of the parties was that the words, " *all losses to be equally borne*," was that each should bear any loss that might occur, in proportion to his interest. Equality is said to be equity, which judges according to what is good and equal, and we do not perceive that construing the words, " all losses shall be equally borne," to mean that they shall be borne in proportions equal to their respective interests, does any violence to the English lan-

guage.   By reference to the word equal in Webster's Dictionary, folio edition, pages 471 and 475, we find it, amongst many other definitions, stated, " Equal," " being in just proportion," " to make equivalent to," "to recompense fully," "to answer in full proportion"  We are satisfied, therefore, that the words ought to be interpreted and construed to mean that Fry shall answer to Hawley in full proportion to his interest.   From a just and proper reading of the receipt itself, therefore, without any " resort to the aid of the light of surrounding circumstances," it seems to us that the construction placed upon this instrument by the Conrt below is the correct one.

But let us take a view of those circumstances and see whether they are calculated to sustain or change this view of the subject.   One fact deemed of some moment is, that the complainant is an engineer, and it was a matter of considerable importance to him to obtain constant employment as *such,* at good wages.   This seems to have been one object which it appears he accomplished by it ; for, although no reference is made in the receipt given by Hawley to Fry, for this $1,500, to the agreement between Hawley and Allen respecting the purchase of the steamboat, yet it clearly appears by reference to the bill of complaint in this case that the complainant was fully aware of it, for he commences with the charge that " Nelson Hawley informed him that, in connection with Henry Allen, he had obtained a contract to carry the United States mail from the port of Apalachicola to a point on the Apalachicola river, known as Chattahoochee ; that said contract was to continue four years, at a yearly stipend of $2,600 ; that said Hawley also informed him (Fry) that he was desirous of purchasing a boat to carry said mail and perform said contract, and that it would require about $6,000 to purchase a suitable boat for the purpose aforesaid ; that he was to furnish $3,000 and said Allen to furnish the remaining $3,000, and each was to own one moiety in the said contract and the said

boat." And on looking into this contract we find one of its stipulations to be that "Daniel Fry it to be employed in the capacity of engineer, (to furnish his second,) at a salary of $135 per month, so long as he faithfully discharges his duties in that capacity, to the satisfaction of the master of the boat ;" and the fact which the evidence discloses that he has been thus employed, with his brother as his second, ever since the boat has been running on the Apalachicola river, at the wages mentioned, leads to the irresistible conclusion that this stipulation was inserted by the parties, after an understanding with him on the subject. Now, it is very extraordinary that the complainant, with the intimate knowledge he possessed of the agreement between Allen and Hawley, in making his agreement with Hawley, did not also take care to have an express stipulation inserted by Hawley in the receipt given by him to complainant, that he should have one *moiety* or *half* of Hawley's half or moiety of said boat and the profits accruing from said contract, if such were the *intention* of the parties. Indeed, if the transaction was to have been, as is contended, of such a nature as to make it a *quasi partnership* between the three, Allen, Hawley and Fry, so as to make Fry liable beyond the sum of $1,500 advanced by him, it is not easy to account for the fact that he did not at once enter into the agreement with Allen and Hawley, or why they did not require him to do so, and thus make him equally liable with Hawley for any outlay beyond the $6,000. There is no evidence that Fry ever set up a claim against Hawley for one-fourth of the boat and profits, &c., until the commencement of this suit, and such a claim is inconsistent with the acts of the complainant himself, who, as appears by the answer of the defendant, Hawley, responsive to the bill, and by the testimony in the case, offered to take one-sixth interest in the said boat—an offer quite inconsistent with the claim of a right to one-fourth. The Court assents to the proposition of the counsel for Mr. Hawley that "to entitle the complainant

Fry to a specific performance of the agreement which he insists on, it must appear that the defendant, Hawley, had a remedy against him to compel performance of his (Fry's) part of such contract." It seems to be very generally and very properly laid down in the books that a court of equity will never decree a specific performance where the remedy is not mutual, or one party only is bound by the agreement, Parkhurst v. Van Cortlandt, 1 Johnson's Chancery Reports, 282, and authorities there cited. 2 Story's Equity, section 723. Fry had advanced $1,500 ; the boat has cost $15,000 ; one-fourth of the cost is $3,750—where was Hawley's remedy to compel Fry to pay the difference, $2,250 ?

It is contended on behalf of the complainant that the agreement on the face of it and by equitable interpretation is both certain and fair ; that nothing is asked for by him which is either inequitable or unjust; that so far as the principle of mutuality is involved, the agreement on the part of the complainant is *executed ;* that he paid the amount of his contribution at the time of entering into the contract. If this be so, if the contract on the complainant's part was *executed* by the payment of the sum of $1,500 at the time he entered into the contract, and we think it was, then surely there is *no* mutuality.

An agreement must depend on the circumstances at the time, and cannot be made better or worse by subsequent facts. Morris v. Burroughs, 1 Atkyns, 404. Subsequent acts cannot be given in evidence to explain any ambiguity in a written contract. Chitty on Contracts, 106. 1 Atkyns, 404, 605. The debt contracted by Allen in building the boat was in no wise a liability of Fry. Hawley and Allen *alone* were bound for that debt. Fry was not liable for it. So far as we are able to discover, from any thing which the record discloses, he was not liable over to Hawley. Fry, by the payment of his $1,500 into Hawley's hands, obtained a permanent situation as engineer, at $135 per month, and an interest in the steamboat and the profits, &c., in proportion

36

to the amount he advanced.    These were strong and, no doubt, the controlling inducements to make this advance, [and in construing a contract the court will look to the motives that led to it, and the object intended to be effected by it, Davis et al. v. Barney, 2 Gill & Johnson, 382,] and we do not deem a contract very onerous, by which a man gets $1,273 in a little more than one year on an investment of $1,500, and a permanent situation besides, as engineer, at $135 per month.

Upon the whole, therefore, we see no reason to disturb the decree of the Court below, and it is consequently in all things affirmed.

*Per totam Curiam.*